**Corrected**

# In the United States Court of Federal Claims

**FOR PUBLICATION**

Nos. 18-523C & 21-1825C
(Filed: December 2, 2022)

| | |
|---|---|
| **BRADLEY T. WOLFING, *et al.*,** ) | |
| ) | |
| *Plaintiffs,* ) | |
| ) | Military Pay: Housing Allowances |
| **RICHARD G. GULLEY, *et al.*,** ) | under 37 U.S.C. § 403; Travel |
| ) | and Transportation Allowances |
| *Consolidated Plaintiffs,* ) | under 37 U.S.C. § 474 (repealed |
| **v.** ) | and recodified at 37 U.S.C. § 452) |
| ) | |
| **UNITED STATES,** ) | |
| ) | |
| *Defendant.* ) | |
| ) | |

*Patrick J. Hughes*, Patriots Law Group of Lyons & Hughes, P.C., Suitland, MD, for plaintiffs. *Michael E. Lyons*, Patriots Law Group of Lyons & Hughes, P.C., Suitland, MD, Of Counsel.

*Douglas G. Edelschick*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, for defendant, with whom on the briefs were *Brian M. Boynton*, Assistant Attorney General, and *Patricia M. McCarthy*, Director, *Douglas K. Mickle*, Assistant Director, and *Kyle S. Beckrich*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC. *Major Alane E. Ballweg* and *Christopher C. Cox*, Litigation Attorneys, U.S. Army Legal Service Agency, Fort Belvoir, VA, Of Counsel.

## OPINION AND ORDER

***BONILLA, Judge.***

The origins of the United States Army Reserve (USAR) date back over 100 years to the passage of the 1920 amendments to the National Defense Act of 1916. *See* Pub. L. No. 66-242, 41 Stat. 759 (1920). Today, nearly 190,000 soldiers serve in the USAR, residing in all 50 states and five United States territories and

deployed to 23 countries around the world.  Despite providing "nearly half of the Army's maneuver support and a quarter of its force mobilization capacity," the USAR accounts for "only 6% of the total Army budget."[1]  This military pay case addresses the statutory and regulatory issues governing the claimed entitlement to dual housing allowances by members of the USAR during periods of mobilization and deployment.

## BACKGROUND[2]

Plaintiffs are current, retired, and former members of the USAR and the Army National Guard (ARNG) residing in various states throughout the continental United States.[3]  At some point relevant hereto, each plaintiff was called to active duty and deployed overseas in support of contingency operations (CONOPS) and/or for Active Duty Operational Support (ADOS) for periods exceeding 30 days.  Plaintiffs' overseas primary duty stations (PDS) were not located near the domestic primary residences from which they were activated.  Critical to the legal issues presented, plaintiffs' mobilization and deployment orders did not provide for military quarters at or near their overseas PDS, requiring plaintiffs to secure their

---

[1] *See* https://www.usar.army.mil/About-Us/ (last visited Nov. 28, 2022).

[2] Due to the initial voluntary remand request by the government ultimately lasting two years (from August 2019 to August 2021), the parties' subsequent joint request for a continued stay, and the government's current request for a second voluntary remand, discussed *infra*, this consolidated case remains in the early stages of litigation.  Indeed, the record presented is limited to: the complaints filed in each of the now-consolidated cases; plaintiffs' proposed amended complaint; the remand decisions of the Army Board for Correction of Military Records (ABCMR or Board) limited to the original *Wolfing* plaintiffs; and various documents attached to the parties' briefs addressing a series of procedural motions, defendant's motion to dismiss, and the supplemental briefing requested by the Court.  The facts stated herein are derived from the filings to date.

[3] The initial 11 plaintiffs in this consolidated case include (by rank and alphabetically): Colonel Richard G. Gulley (USAR-retired); Colonel Bradley T. Wolfing (USAR-retired); Lieutenant Colonel Sean Connelly (USAR); Major James B. Copas (USAR); Major Erika Erickson (USAR); Major Ryan P. Mirabal (USAR); Major Louis T. Morelli (USAR); Major William C. Schneck (USAR); Major Jennifer Walters (USAR); Captain Alexander R. Gardiner (USAR); and Captain Timothy J. Kibodeaux (USAR).  During oral argument conducted on November 30, 2022, by consent, the Court sanctioned the joinder of 22 additional plaintiffs named in the second amended complaint: Lieutenant Colonel Oscar Quintero (ARNG); Lieutenant Colonel William Wahlfeld (USAR); Major Parker Chapman (USAR); Major Anthony Hirsch (USAR-resigned); Major Jonathan Judy (ARNG); Major Fred Keller (USAR-retired); Major Susan Lindsey (USAR); Major Shane Maher (USAR); Major Alexis Melendez (USAR); Major Christopher Moskoff (USAR); Major Freddy Munoz (ARNG); Major Daniel Nichols (USAR); Major Scott Slaugh (USAR); Major Scott Wyly (USAR); Captain Justin McGinley (USAR); Captain Matthew Silva (USAR); First Lieutenant Joseph Hoffman (ARNG); Chief Warrant Officer 4 Nicholas Capozzi (USAR-retired); Chief Warrant Officer 3 Timothy Brooks (USAR); Command Sergeant Major Erich Muehleisen (USAR); Sergeant First Class Carona Brown (USAR); and Sergeant First Class Danika Woodland (USAR).  *See* ECF 106–107.  For clarity, in summarizing the background of this case, the Court focuses on the experiences of the initial 11 plaintiffs as representative of the growing number of parties to this litigation.

own housing; nor did plaintiffs' CONOPS or ADOS orders authorize the transportation of household goods from their primary residences to their PDS at government expense.  Mobilization and deployment orders for reservists with dependents further did not authorize the relocation of the members' dependents to the members' PDS at government expense.

During their periods of deployment, each plaintiff requested two housing allowances from the Army: a basic allowance for housing (BAH) to maintain their primary (domestic) residence and an overseas housing allowance (OHA) to subsidize their PDS off-base housing.  Unlike active duty service members, reservists generally return to their primary residences at the conclusion of their deployments to resume their civilian lives and part-time military duties.  For nine (of the eleven) plaintiffs, the Army initially approved the requested dual housing allowances and remitted monthly BAH and OHA payments.

In October 2016, the U.S. Army Garrison Wiesbaden Finance Office identified approximately 140 USAR and National Guard members suspected of collecting excessive or unauthorized dual housing allowances and forwarded its findings to the Army Criminal Investigation Division (Army CID).  *See* ECF 70 at 32–34.[4]  Army CID, in turn, initiated criminal investigations of the identified service members–including six (of the nine) plaintiffs receiving both BAH and OHA–for alleged housing allowance fraud, theft, and/or larceny.[5]  In Major Copas' case, court-martial proceedings were commenced.  At the conclusion of the investigations, the six plaintiffs under investigation by Army CID received General Officer Memoranda of Reprimand (GOMOR) from the Commanding General. All nine plaintiffs receiving BAH and OHA payments were ordered to repay the Army between $5,500 and $136,000, of which six plaintiffs were subject to wage garnishments between $5,500 and $30,000, and an overlapping six plaintiffs forfeited BAH on their primary residences ranging from $12,500 and $30,000.  As for the two plaintiffs who were not initially approved for dual housing allowances, Major Walters was instructed to elect either BAH *or* OHA, and Major Erickson was authorized to receive *only* BAH.

---

[4] Unless otherwise noted, all ECF citations refer to *Wolfing* docket entries.

[5] The six plaintiffs investigated by Army CID were Colonel Gulley, Colonel Wolfing, Major Copas, Major Mirabal, Captain Gardiner, and Captain Kibodeaux.  Colonel Gulley was also the subject of a U.S. European Command Inspector General (USEUCOM-IG) investigation.

After a subset of plaintiffs pursued relief through their respective chains of command and administrative channels with limited success,[6] on April 9, 2018, seven plaintiffs commenced this action by filing the *Wolfing* complaint.[7]  Thereafter, on September 9, 2021, two additional plaintiffs (now four) filed the related *Gulley* complaint.[8]  In both actions, the named plaintiffs seek to certify classes of similarly situated USAR members.[9]  In the interim, on August 29, 2019, the Court denied defendant's motion to dismiss the *Wolfing* complaint for lack of subject matter jurisdiction pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims (RCFC); concomitantly, the Court granted defendant's motion for a voluntary remand to the ABCMR.  *See Wolfing v. United States*, 144 Fed. Cl. 516 (2019) (*Wolfing I*).

On August 10, 2021, the ABCMR issued separate decisions granting administrative relief to the seven *Wolfing* plaintiffs.  Specifically, the Board found the USAR members were authorized to receive dual housing allowances and, consequently, directed that the members' military records be corrected to reflect their entitlement to: both BAH (for their primary residences) and OHA (for their PDS off-base housing during periods of overseas deployment); the refund of any garnishments; payment of any housing allowances forfeited; expunge of all adverse information related to the Army's investigations into the alleged overpayments; and the convening of special selection boards (SSBs) for any plaintiffs non-selected for promotion during which time adverse information (now-purged) was included in their military personnel records.  *See* ECF 52-1 to 52-7.  On August 27, 2021, the

---

[6] Colonel Wolfing, for example, was able to retire at his current grade and recoup his entitlement to BAH for his primary residence; the record is silent on whether the Army sought repayment of OHA remitted and whether Colonel Wolfing's GOMOR was formally rescinded.  Captain Kibodeaux's GOMOR was removed from his permanent military personnel file but not formally rescinded; nevertheless, Captain Kibodeaux's alleged OHA debt remained, and his garnishment continued. The record presented is unclear as to whether any other plaintiffs received administrative relief prior to filing this action.

[7] The original *Wolfing* plaintiffs included Colonel Wolfing, Major Copas, Major Mirabal, Major Morelli, Major Schneck, Captain Gardiner, and Captain Kibodeaux.

[8] The original *Gulley* plaintiffs included Colonel Gulley and Major Walters.  By Order dated April 12, 2022, the Court granted plaintiffs' motion to add Lieutenant Colonel Connelly and Major Erickson. *See* ECF 81.

[9] Although both complaints were titled "Class Action Complaint," the motions for class certification were not contemporaneously filed.  *Compare Wolfing* ECF 1 (complaint filed Apr. 9, 2018) *with Wolfing* ECF 70 (motion to certify class filed Jan. 24, 2022); *compare Gulley* ECF 1 (complaint filed Aug. 9, 2021) *with Gulley* ECF 6 (motion to certify class filed Sept. 29, 2021).  At the parties' joint request, briefing on the class certification issue was stayed pending the Court's resolution of the overarching statutory and regulatory issues addressed herein.  *See* ECF 92.  The Court thereafter denied the duplicative motion (filed in *Gulley*) as moot and, again at the parties' joint request, continued the stay of the motion for class certification filed in *Wolfing* pending conclusion of the remand proceedings directed in this Opinion and Order.  *See* ECF 106.

Secretary of the Army formally approved the ABCMR's recommendations.  The Army then transmitted the *Wolfing* plaintiffs' corrected military records to the Department of Defense, Defense Finance and Accounting Service (DFAS), for evaluation, processing, and payment of backpay due.[10]

On January 27, 2022, DFAS issued a memorandum concluding that, based upon the factual records presented, none of the *Wolfing* plaintiffs save Major Morelli (who had no dependents at any time relevant hereto) were entitled to the contested secondary housing allowances.  DFAS explained that under the governing statute, 37 U.S.C. § 403, all service members entitled to basic pay are entitled to *one* housing allowance: *either* BAH *or* OHA, depending on the location of their primary residence (i.e., domestic or overseas).  DFAS noted that § 403 provides only the following two exceptions to the one-housing-allowance limit.

First, § 403(d) permits the payment of a family separation housing allowance (FSH) to all services members (active duty and reserve component alike) *with dependents* who do not accompany the member to their PDS or otherwise reside near the PDS.  Known as FSH-B or FSH-O, depending on whether the deployment is domestic or overseas, FSH is paid at the same rate as BAH or OHA for the member's PDS.  Because the corrected military records transmitted to DFAS did not conclusively document whether the six *Wolfing* plaintiffs with dependents were in fact *separated* from their dependents during all or part of their overseas deployments, DFAS found that it lacked critical information to determine whether FSH-O was authorized.

Second, § 403(g) allows reservists *without dependents* to receive both BAH to maintain their primary residence and OHA to subsidize their PDS off-base housing during periods of overseas deployment.  As the sole claimant without dependents, DFAS concluded Major Morelli was entitled to the dual housing allowances requested.  Accordingly, in early 2022, DFAS approved, processed, and remitted payment to Major Morelli in the aggregate amount of $19,618.71 in back pay. *See* ECF 85 at 46.

---

[10] By federal regulation governing the ABCMR:

(i) The ABCMR will furnish DFAS copies of decisions *potentially* affecting monetary entitlement or benefits. The DFAS will treat such decisions as *claims for payment by or on behalf of the applicant*.

(ii) The DFAS will settle claims on the basis of the corrected military record. The DFAS will compute the amount due, if any. The DFAS may require applicants to furnish additional information to establish their status as proper parties to the claim and to aid in deciding amounts due. . . . The applicant's acceptance of a settlement fully satisfies the claim concerned.

32 C.F.R. § 581.3(h)(2)(i)–(ii) (emphasis added).

Pending before the Court is defendant's motion for a second voluntary remand to the ABCMR to determine: whether the relief awarded Major Morelli during the initial remand constituted an appropriate exercise of discretion by the Secretary of the Army; and whether the six *Wolfing* plaintiffs with dependents are statutorily permitted to receive FSH-O for some or all of their periods of overseas deployment (i.e., whether they and their dependents were in fact separated during the deployment). Concomitantly, defendant seeks to have the ABCMR assess whether the military records of the four *Gulley* plaintiffs and the 22 newly joined plaintiffs–with and without dependents–should be corrected to reflect their entitlement and award of dual housing allowances: BAH and OHA for service members without dependents, and BAH and FSH-O for service members with dependents.[11] In turn, plaintiffs seek to file an amended complaint to assert an alternative theory of monetary relief for service members with dependents that were deemed ineligible (in whole or in part) to recover OHA or the equivalent FSH-O. Plaintiffs proffered alternative theory is based on the Travel and Transportation Allowances (Per Diem) statute, 37 U.S.C. § 474 (2016) (repealed and recodified at 37 U.S.C. § 452 (2021)), and the implementing United States Department of Defense (DOD) regulations.

The parties agree a second remand is warranted to address the issues outlined above. So does the Court. In addressing reservists with dependents' entitlement to FSH-O, the Secretary of the Army should also consider whether a dependent residency waiver is appropriate given the general need for reservists to return to their primary residence following their deployment. The purpose of this Opinion and Order is to resolve the contested statutory and regulatory issues governing reservists' housing allowance entitlements during periods of deployment. For the reasons set forth herein, plaintiffs' motion to file an amended complaint to assert an alternative theory of monetary relief (ECF 96) is GRANTED, and defendant's motion to remand this matter to the ABCMR (ECF 72) is GRANTED with the instructions specified herein.

---

[11] The *Gulley* plaintiffs with dependents include Colonel Gulley and Lieutenant Colonel Connelly. Major Erickson and Major Walters did not have dependents at any time relevant hereto. The newly joined 22 plaintiffs similarly include current and former reservists, presumably with and without dependents.

## ANALYSIS

I.       **Housing Allowance Entitlement**

      **A.  Basic Allowance for Housing**[12]

      BAH is a military allowance intended to subsidize the cost of domestic housing for service members (active duty and reserve component alike) who do not receive government-provided housing.  The amount of the monthly stipend generally depends on where the service member resides, their pay grade, and whether they have dependents.[13]  Title 37, United States Code, Section 403(a) establishes a "[g]eneral entitlement" for members of the uniformed services to be paid BAH if they are authorized to receive basic pay.[14]  Although there are specified exemptions and limitations to the housing allowance entitlement,[15] § 403(a) is a money-mandating statute.  *Wolfing I*, 144 Fed. Cl. at 520 (quoting 37 U.S.C. § 403(a)); *see Deggins v. United States*, 178 F.3d 1308, No. 98-5057, 1998 WL 804563, *3 (Fed. Cir. 2000) (*per curiam*) (table) (contrasting discretionary nature of variable housing allowance statute, 37 U.S.C. § 403a (repealed 1998), with entitlement under BAH statute, *id.* § 403(a)).  OHA is the basic allowance for housing generally applicable to service members on active duty outside the United States.  *Compare* 37 U.S.C. § 403(b) *with id.* § 403(c); *see* JTR Ch. 10, Part A, ¶ 10002(A) (ECF 85 at 74–75).

      Generally, under the BAH/OHA entitlement structure, service members of the same rank, dependency status, and PDS location receive housing allowances at the same rate.  As detailed *infra*, however, applicable laws and implementing regulations augment the general one-housing-allowance limit, reflecting congressional and secretarial intent to accommodate the diverse circumstances

---

[12] Throughout this Opinion and Order, the Court purposely uses "basic allowance for housing" (spelled out) to refer generally to a military housing allowance without regard to location or rate. The Court uses the acronym "BAH" to refer specifically to a United States-based housing allowance as opposed to "OHA," which refers to the basic allowance for housing typically paid to service members deployed overseas.

[13] *See* https://militarypay.defense.gov/pay/allowances/bah.aspx (last visited Nov. 28, 2022).

[14] The basic pay entitlement statutes for active duty service members, reservists, and members of the National Guard are found at 37 U.S.C. §§ 204 & 206.

[15] Statutory exceptions to the BAH general entitlement include instances where: a service member is assigned adequate government housing, *see* 37 U.S.C. § 403(e)(1); a service member without dependents initially deploys "for assignment to a unit conducting field operations," *id.* § 403(f)(1); and a service member below a certain rank without dependents "is assigned to sea duty," *id.* § 403(f)(2).  Like the general entitlement codified at § 403(a), these exceptions are similarly nuanced and are not absolute.

in which the United States' over two million service members find themselves. For example, Congress and the Secretary of Defense have devised special housing allowance rules for reservists and active duty service members whose deployments prevent them from residing with their dependents. At the same time, Congress and the Secretary have implemented strict housing allowance eligibility requirements designed to prevent housing allowance fraud, waste, and abuse. As highlighted herein, the regulations enacted to meet service members' nuanced housing needs do not always align with the rules enacted to prevent housing allowance fraud.

While the rate of a service member's BAH or OHA entitlement is typically based on the service member's PDS location, federal law creates two exceptions relevant here. First, § 403(d) provides: "If a [service] member [(active duty or reserve component)] with dependents is assigned to duty in an area that is different from the area in which the member's dependents reside," the service member's BAH or OHA rate shall be based "on the area in which the dependents reside *or* the member's last duty station, whichever the Secretary concerned determines to be most equitable."[16, 17]  37 U.S.C. § 403(d)(3)(A) (emphasis added). Thus, while the payment of BAH or OHA remains an entitlement, the military Secretaries are vested with discretion to determine the most appropriate BAH/OHA rate where a service member and their dependents reside separately due to the member's active duty deployment.[18] The Secretary of Defense elected to base the affected service

---

[16] Reservists, unlike their active duty counterparts, often do not have a "last duty station" because they are typically deployed from their primary residence rather than from a duty station. The Secretary of Defense accordingly determined, for housing allowance purposes, a reservist's "last duty station" is their primary residence (i.e., residence from which they were deployed). *See* ECF 85 at 41.

[17] Section 403(d)(3) provides the Secretary with similar discretion in situations where the service member's new assignment is "under the conditions of a low-cost or no-cost permanent change of station or permanent change of assignment," *see id.* § 403(d)(3)(B), or "for a period of not more than one year for the purpose of participating in professional military education or training classes," *see id.* at § 403(d)(3)(C).

[18] 37 U.S.C. § 403 confers some discretionary authority in "the Secretary concerned," *see, e.g.*, *id.* § 403(d)(3)(A), but vests general rulemaking authority under this section in the Secretary of Defense. *See id.* § 403(k)(1). In this case, "the Secretary concerned" is the Secretary of the Army. *See id.* § 101(5). However, for the times relevant hereto, the Secretary of the Army deferred "[c]onditions of entitlements and rates payable" for housing allowances to the Secretary of Defense. *See* Army Regulation (AR) 37-104-4, Ch. 12, §§ 12–1 & 13–1 (2005) (superseded by AR 637–1 (July 2021)). In turn, the Secretary of Defense promulgated the Financial Management Regulations (FMR) and Joint Federal Travel Regulations (JFTR), which merged with the Joint Travel Regulations (JTR) in October 2014. *See* https://www.travel.dod.mil/Policy-Regulations/Joint-Travel-Regulations/Archive/ (last visited Nov. 16, 2022). Since the causes of action in this case began accruing in or about October 2016, the bulk of the regulations relevant hereto are found in the October 1, 2016 edition of the JTR. The "Housing Allowances" chapter (Chapter 10) of the October 1, 2016 edition of the JTR was appended to plaintiffs' supplemental brief. *See* ECF 85 at 65–166.

members' BAH or OHA entitlement on the location where the member's dependents reside.[19]  *See, e.g.,* JTR Ch. 10, Part E, Table 10E-3, Rule 4 (ECF 85 at 122).

The second exception is found in the DOD Joint Travel Regulations, which provide:

> A[ reserve component] member called/ ordered [sic] to active duty for more than 30 days, except a member without dependents during initial entry training, is authorized *primary residence-based* BAH/OHA beginning on the first active duty day.  This rate continues for the tour duration except as noted . . . .

JTR Ch. 10, Part E, ¶ 10428(E)(1) (ECF 85 at 164) (emphasis added).[20]  In turn, the regulations state that "primary residence" as understood in "Primary Residence of Reserve Component (RC) Member . . . ordered to active duty" is defined as the "dwelling . . . where the RC member resides before being ordered to active duty." *See* JTR App. A, Part 1 at A1-37 (ECF 85 at 173).  Accordingly, this DOD regulation provides another means by which a service member's BAH or OHA rate may be based on a location other than their PDS.

### B. Dual Housing Allowances

Plaintiffs claim entitlement to *two* housing allowances during their periods of deployment: BAH for their primary residence (from which they were deployed) and OHA for their overseas (non-military) housing.  To assess plaintiffs' claims, the Court proceeds from the longstanding tenet that "[a] soldier's entitlement to pay is dependent upon statutory right."  *Bell v. United States*, 366 U.S. 393, 401 (1961).  The applicable statute in this case generally entitles a service member to *one* housing allowance:

---

[19] Even though these members' statutory housing entitlement is not based on their PDS, they are generally eligible to also receive a statutorily discretionary PDS-based allowance in the form of the "family separation basic allowance for housing" (FSH), *see* 37 U.S.C. § 403(d)(1), discussed *infra*.

[20] However, if a reservist called to active duty training (ADT) for at least 140 days is authorized to transport their household goods from their primary residence to their PDS at government expense, their housing allowance will be based on the location of their PDS.  *See* JTR Ch. 10, Part E, ¶ 10428(E)(1)(a) (ECF 85 at 164).  Likewise, if a reservist called to active duty for something other than ADT for at least 180 days is authorized to transport their household goods at government expense, their housing allowance will be based on the location of their PDS.  *See id.* ¶ 10428(E)(1)(c) (ECF 85 at 164).

> **General entitlement**. . . .  Except as otherwise provided by law,
> a member of a uniformed service who is entitled to basic pay is
> entitled to *a* basic allowance for housing . . . .  The amount of
> *the* basic allowance for housing for a member will vary . . . .
> *The* basic allowance for housing may be paid in advance.

37 U.S.C. § 403(a) (bold in original; italics added).  Where the statute permits
dual housing allowances the language is clear.  *See, e.g.*, *id.* § 403(d)(4) ("A family
separation basic allowance for housing paid to a member under this subsection is
*in addition to* any other allowance or per diem that the member receives under this
title.  A member may receive a basic allowance for housing under *both* paragraphs
(1) *and* (3)." (emphasis added)); *id.* § 403(g)(2) ("The member may receive *both* a
basic allowance for housing under paragraph (1) *and* under this paragraph for the
same month . . . ." (emphasis added)).

    Plaintiffs' claimed dual housing allowance entitlements must be analyzed
under different statutory and regulatory schemes depending on whether or not the
reservist had dependents during the time of their deployment.  Plaintiffs without
dependents include Major Erickson, Major Morelli, and Major Walters.  Plaintiffs
with dependents include Colonel Gulley, Colonel Wolfing, Lieutenant Colonel
Connelly, Major Copas, Major Mirabal, Major Schneck, Captain Gardiner, and
Captain Kibodeaux.

### i. *Reservists Without Dependents*

    As with all service members entitled to basic pay, reservists without
dependents are statutorily entitled to *one* BAH/OHA.  Section 403(g)(1) provides:

> A member of a reserve component without dependents who is called
> or ordered to active duty to attend accession training, in support of a
> contingency operation, or for a period of more than 30 days . . . *may not
> be denied* a basic allowance for housing if, because of that call or order,
> the member is unable to continue to occupy . . . [their] primary
> residence . . . [if] owned by the member or for which the member
> is responsible for rental payments.

37 U.S.C. § 403(g)(1) (emphasis added).  The phrase "may not be denied" in
§ 403(g)(1) unequivocally denotes an entitlement.  While the governing statute is
silent as to the rate of the housing allowance, the DOD Joint Travel Regulations
specify the entitlement is typically based on the location of the service member's
primary residence.  *See* JTR Ch. 10, Part E, ¶ 10428(E) (ECF 85 at 164).  An
exception applies where the reservist is authorized transportation of household
goods from their primary residence to their PDS at government expense; in that

case, PDS rather than primary residence sets the applicable rate.  *See id.*
¶ 10428(E)(1)(a) & (c) (ECF 85 at 164).

Section 403(g) also permits–but does not require–military Secretaries to
remit a *second* housing allowance to reservists without dependents so long as they
are not authorized transportation of household goods:

> The Secretary concerned *may* provide a basic allowance for housing to
> a [reserve component member without dependents] at a monthly rate
> equal to the rate of [BAH] or [OHA], whichever applies to the location
> at which the member is serving, for members in the same grade at that
> location without dependents. The member may receive *both* a basic
> allowance for housing under [§ 403(g)](1) *and* under this paragraph for
> the same month, but may not receive [per diem] for lodging expenses if
> a basic allowance for housing is provided under this paragraph.

37 U.S.C. § 403(g)(2) (emphasis added).

Read together, the statutory provisions indicate that a reservist without
dependents (and not authorized transportation of household goods) receives dual
BAH/OHA: the first (mandatory) housing allowance is based on their primary
residence under § 403(g)(1); and the second (discretionary) housing allowance
is based on their PDS under § 403(g)(2).  If a reservist without dependents *is*
authorized transportation of household goods, they are entitled to (and permitted)
only *one* housing allowance based on their PDS.  *See* 37 U.S.C. § 403(a), (g)(3); JTR
Ch. 10, Part E, ¶ 10428(E)(1)(a), (c) (ECF 85 at 164).  The rationale is presumably
that the movement of all personal belongings to the PDS obviates the need to
maintain a primary residence in the location from which the reservist was deployed.

Further, where, as here, the Secretary of Defense is statutorily vested with
the discretion to convert the discretionary (second) housing allowance into an
entitlement, *see* 37 U.S.C. § 403(k) ("The Secretary of Defense shall prescribe
regulations for the administration of this section."), the record must document the
affirmative act establishing the entitlement.  The DOD Joint Travel Regulations
do not create a second housing allowance entitlement for otherwise qualified
reservists.  To the contrary, the Decision Logic Table for Reserve Component
Members explains: when a reservist is deployed on active duty away from their
primary residence (and not authorized transportation of household goods), they
will receive "primary residence-based BAH/OHA."  *See* JTR Ch. 10, Part E, ¶ G at
Table 10E-16, Rules 1–2, 5–6 (ECF 85 at 165).  The table makes no mention of an
additional housing allowance based on PDS or otherwise.  The "primary residence-
based BAH/OHA" to which the table refers is the same allowance reservists without
dependents are entitled to receive under § 403(g)(1).

Moreover, "NOTE 5" cited in Rule 5, referenced *supra*, provides:

> A[ reserve component (RC)] member without dependents authorized [permanent change of station (PCS)] allowances to an OCONUS location, but not authorized [household goods] transportation, and Gov't Qtrs are not available, receives BAH/OHA based on the primary residence rate, unless the Secretarial Process authorizes/approves the PDS rate . . . .

JTR Ch. 10, Part E, ¶ G at Table 10E-16 n.5 (ECF 85 at 166).  By reserving the right to authorize or approve a discretionary PDS-based housing allowance *instead of* a primary residence-based housing allowance, the implementing regulation impliedly does not mandate the payment of a PDS-based (or second) housing allowance.[21]

To be clear, the DOD Joint Travel Regulations are consistent with § 403. As demonstrated by this case, however, the statute and implementing regulations can generate inequitable results.  For example, when called to active duty and deployed, a reservist *not* provided PDS government housing and *not* authorized transportation of household goods is entitled to only *one* housing allowance despite having to maintain two households (i.e., primary residence and PDS housing). Meanwhile, a reservist provided PDS government housing is entitled to the same primary residence-based allowance while living rent free at their PDS.  Similarly, a reservist authorized transportation of household goods will receive a PDS-based housing allowance, which obviates their need to maintain the now-empty primary residence.  In other words, reservists who need to maintain *two* residences are entitled to the same or even a lesser housing allowance than similarly situated reservists who need to maintain only *one*.[22]

---

[21] As noted *supra*, the Secretary of the Army, through the ABCMR, authorized and approved the payment of both BAH and OHA to Major Morelli.  The Court remains agnostic on whether the *discretionary* OHA payment was proper and whether Major Erickson and Major Walters should similarly receive a *second* housing allowance.

[22] As noted *supra*, military Secretaries may authorize a housing allowance based on a reservist's PDS rather than the location of their primary residence where a primary residence-based housing allowance would be inequitable.  *See* JTR Ch. 10, Part E, ¶ 10428(E)(1)(e) (ECF 85 at 164–65).  This may provide some relief, as PDS-based allowances tend to be higher than primary residence-based housing allowances, particularly if overseas; however, this difference will rarely, if ever, account for the cost of maintaining two residences rather than one.

*ii.   Reservists With Dependents*

*1.   Dependents Not Residing At or Near PDS*

By statute, a service member (active duty or reserve component) with dependents "assigned to duty in an area that is different from the area in which the member's dependents reside . . . is entitled to [BAH or OHA], whichever applies to the member, . . . based on the area in which the dependents reside or the member's last duty station, whichever the Secretary concerned determines to be most equitable." *See* 37 U.S.C. § 403(d)(3)–(d)(3)(A) (referencing 37 U.S.C. § 403(b) & (c)). As explained *supra*, a reservist's "last duty station" refers to the member's primary residence from which they were activated. Moreover, as codified in the governing statute, this basic housing allowance is an "entitle[ment]." *See id.* § 403(d)(3).

Like § 403(g), § 403(d) also permits–but does not require–military Secretaries to remit a *second* housing allowance to active duty service members and reservists with dependents, subject to the following conditions: dependent relocation is not authorized at government expense; "the member's dependents do not reside at or near the [PDS]"; and the member is not assigned government quarters. 37 U.S.C. § 403(d)(1)–(2). Indeed, § 403(d)(4) provides:

> A family separation basic allowance for housing paid to a member under this subsection is *in addition to* any other allowance or per diem that the member receives under this title. A member *may* receive a basic allowance for housing under *both* paragraphs (1) [i.e., FSH] *and* (3) [i.e., BAH or OHA].

*Id.* § 403(d)(4) (referencing 37 U.S.C. § 403(d)(4)(1) & (3)) (emphasis added). In accordance with § 403(d), discussed *supra*, a qualifying service member necessarily receives BAH or OHA based on either their dependents' location or their last duty station (or primary residence in the case of a reservist). The discretionary FSH, in turn, is paid at the same rate as BAH/OHA for members without dependents at the qualifying service member's PDS.[23] 37 U.S.C. § 403(d)(1) (referencing 37 U.S.C. § 403(b) & (c)).

In promulgating the DOD Joint Travel Regulations, the Secretary of Defense converted the discretionary FSH into an entitlement for qualifying members. Specifically, the regulations provide:

---

[23] Military Secretaries may authorize FSH-B or FSH-O for qualifying members stationed domestically or overseas, respectively. *See* JTR Ch. 10, Part A, ¶ 10002(B)(3) (ECF 85 at 75).

3. FSH *is payable* to a member, with dependents, for added housing expenses resulting from separation from the dependents when a member is assigned to a/an

      a. OCONUS PDS on an unaccompanied/dependent restricted tour, or

      b. PDS in CONUS to which concurrent travel has been denied.

4. General conditions are:

      a. Dependent transportation to the PDS is not authorized at Gov't expense under 37 USC §[]476;

      b. Dependents do not reside in the PDS vicinity; and

      c. Gov't Qtrs are not available for assignment to the member.

JTR Ch. 10, Part E, ¶ 10414(A)(3)–(4) (ECF 85 at 143) (emphasis added).  The phrase "is payable" denotes an entitlement.  *See, e.g.*, *Eastman v. United States*, 33 Fed. Cl. 293, 297–98 (1995) (finding payment mandated by a Federal Travel Regulation that provided: "travel and transportation expenses . . . *are payable*") (emphasis added; citations omitted); *see also Payable (adj.)*, *Black's Law Dictionary* (11th ed. 2019) (defining "payable" as "([o]f a sum of money or a negotiable instrument) that *is* to be paid.") (emphasis added).  This interpretation is reinforced by the language in JTR Ch. 10, Part E, ¶ 10404(A)(2)(b), which provides: "If single-type Gov't Qtrs are not available for a member assigned to an OCONUS PDS, and the dependent does not reside in the PDS vicinity, then FSH *is also authorized*." *Id.* (ECF 85 at 121) (emphasis added); *see also* JTR Ch. 10, Part E, ¶ 10404(B) Table 10E-3, Rules 4 & 8 (ECF 85 at 122) (authorizing BAH/OHA *and* FSH-B/FSH-O to eligible members); JTR App A, Part 1 at A1-4[24] (defining "AUTHORIZE(D)" as "[t]he giving, through these regulations, of an allowance to an eligible individual requiring no other action").

In addition to creating an entitlement to FSH for qualifying service members, the DOD Joint Travel Regulations clarify two issues on which § 403 is silent: (1) the statutory BAH/OHA entitlement is to be paid to FSH-qualifying members *at the with-dependent rate* for the area in which the service member's dependents reside; and (2) the regulatory FSH entitlement is to be paid at the without-dependent

---

[24] Not all DOD Joint Travel Regulations provisions were appended to the parties' briefs.  A complete October 2016 edition is available at https://www.travel.dod.mil/Policy-Regulations/Joint-Travel-Regulations/Archive/ (last visited Nov. 28, 2022).

BAH/OHA rate *for the member's PDS. See* JTR Ch. 10, Part E, ¶ 10404(B)
Table 10E-3, Rules 4 & 8 (ECF 85 at 122).

### 2. Dependents Residing "At or Near" PDS

Service members whose dependents reside "at or near" their PDS are
generally barred from receiving dual BAH/OHA and FSH allowances under
both § 403 and the implementing DOD Joint Travel Regulations. *See* 37 U.S.C.
§ 403(d)(2)(A) (conditioning entitlement to FSH upon whether, inter alia, "the
member's dependents do not reside at or near the [PDS] location"); JTR Ch. 10,
Part E, ¶ 10414(A)(4)(b) (ECF 85 at 143) (conditioning entitlement to FSH upon,
inter alia, whether "[d]ependents do not reside in the PDS vicinity"). The DOD
Joint Travel Regulations qualify this general prohibition by quantifying the
disqualifying dependents' living situations and by specifying the necessary
residency requirements.

First, addressing the number of dependents which cause disqualification or
discontinuation of an otherwise qualified service member's entitlement to FSH,
the DOD Joint Travel Regulations provide:

> <u>Dependents Reside in the Member's PDS Vicinity</u>. FSH-O/FSH-B is
> not authorized if *all* of the member's dependents reside in the PDS
> vicinity. If *some (but not all)* of the dependents voluntarily reside near
> the PDS, FSH-O/FSH-B continues. *See* par. 10000-C for definition of
> vicinity.

JTR Ch. 10, Part E, ¶ 10414(E) (ECF 85 at 144) (underline in original; italics
added). By conditioning FSH disallowance (or discontinuance) on the requirement
that "all" dependents effectively reside with the service member (i.e., "at or near"
or "in the vicinity of" the PDS), the regulation accommodates the realities of diverse
family relationships and living arrangements.[25] The regulation further reflects
secretarial understanding that the need to maintain two residences does not
disappear when some, but not all, of a service member's dependents reside with
them.

Second, the DOD Joint Travel Regulations establish a 90-day limit on
dependents' visits with service members before automatically converting the visit
to formal residency for purposes of discontinuing FSH eligibility. The "Temporary
Social Visits by Dependent" provision of the governing regulation provides that a

---

[25] A service member disqualified for FSH because all of their dependents reside at or near the
PDS is still subject to the default rule under § 403(a), which entitles them to BAH/OHA at the
with-dependent rate for their PDS if they are not provided adequate government housing at the
PDS. *See* 37 U.S.C. § 403(a).

dependent effectively establishes residency "at or near the member's PDS" for FSH purposes if the dependent: visits the PDS *intending* to relocate there or otherwise stays beyond 90 continuous days, *see* JTR Ch. 10, Part E, ¶ 10414(D)(1) (ECF 85 at 144); or stays at the PDS for longer than 90 continuous days regardless of intent, *see* JTR Ch. 10, Part E, ¶ 10414(D)(2) (ECF 85 at 144).

Plaintiffs argue the 90-day rule is intended to prevent housing allowance fraud by *active duty* service members. According to plaintiffs, the 90-day rule prevents an active duty service member from collecting two allowances–one for their PDS residence (where they are *permanently* stationed) and one for their dependents' purported residence (when the service member's dependents actually reside with the member at the PDS) and there is no military-based need for the member to maintain two households. Considering the proffered intent of the 90-day rule, plaintiffs submit it should not apply to the reserve component since reservists– assuming they have not been provided government housing at the PDS and have not been authorized transportation of household goods at government expense– inherently need to maintain two residences: a *secondary* residence at the PDS to serve while deployed and a *primary* residence to return to once their active duty service is complete, regardless of whether they reside with their dependents.

This concern is addressed by the DOD Joint Travel Regulations' third qualification to the general requirement that FSH-eligible service members live apart from their dependents. Using the vernacular "in the member's PDS vicinity" in place of the statutory language "at or near," as referenced above, the DOD Joint Travel Regulations define "vicinity" as follows:

> When a member resides with the dependent and commutes daily to the PDS, the dependent resides in the PDS vicinity regardless of distance even if at a place in an adjacent country or state. A dependent is residing in the PDS vicinity if residing in the same country, state (when in Alaska or Hawaii), or U.S. territory or possession within which the member's PDS is located. *However, if the member has to maintain separate households, a dependent is not residing in the PDS vicinity for FSH purposes if maintaining two households is authorized/approved through the Secretarial Process. . . .*

JTR Ch. 10, Part A, ¶ 10000(C) (Oct. 1, 2016) (ECF 85 at 73) (emphasis added). Rather than select an arbitrary measure of distance and draw an imaginary boundary around the PDS to distinguish dependents who reside "near" the PDS from those who do not, this definition draws upon the practical realities faced by service members and their dependents.[26] As a result, service members who need to

---

[26] During oral argument, government counsel suggested that more recent versions of the FMR modify the above-quoted definition of vicinity. In examining the language of the December 2019 and August 2021 versions of the FMR, the Court finds no material changes in substance from the

maintain two households remain eligible–but are not necessarily entitled–to receive FSH, whereas those who, for example, commute daily to their PDS from a home they share with their dependents no matter the distance may forfeit their eligibility to receive FSH.[27]

The Court recognizes the discretionary nature of the above-highlighted needs-based targeted exception: "[I]f the member has to maintain separate households, a dependent is not residing in the PDS vicinity for FSH purposes *if maintaining two households is authorized/approved through the Secretarial Process*." *See* JTR Ch. 10, Part A, ¶ 10000(C) (ECF 85 at 73) (emphasis added). The affected plaintiffs concede they did not seek authorization or approval to maintain two separate households through the Secretarial Process identified in JTR Ch. 10, Part A, ¶ 10000(C) (ECF 85 at 73). Rightly so, plaintiffs maintain that since they were initially paid (improperly as it turns out) BAH and OHA (rather than BAH/OHA and FSH-O/FHS-B), they could not have known they needed to utilize the Secretarial Process for FSH eligibility. Indeed, as of the publication of this decision, DOD's Military Compensation website continues to erroneously state that service members on unaccompanied tours may receive both BAH and OHA:

> If a member is serving an UNACCOMPANIED overseas tour, the member is eligible for BAH at the "with dependents" rate, based on the dependent's US residence ZIP Code, plus OHA at the "without dependents" rate, if the member is not furnished government housing overseas.

*See* https://militarypay.defense.gov/pay/allowances/bah_types.aspx (last visited Dec. 2, 2022). Through this action, plaintiffs seek retroactive and, in certain cases, prospective secretarial authorization and approval to maintain separate households and, consequently, retain entitlement to BAH/OHA and FSH-B/FSH-O (depending upon their PDS and the location of their primary residence).

---

October 2016 JTR. Although the first and second sentences in the cited versions of the FMR are flipped from the October 2016 JTR, all three definitions focus on the service member's personal (subjective) choice of commute rather than an arbitrary (objective) measure of distance. All three definitions similarly include the discretionary needs-based exception emphasized herein.

[27] Addressing "Family Separation Allowance," the Army's Military Pay and Allowances Policy in effect during the timeframe relevant here similarly provided:

> The purpose of FSH is to pay a member for added housing expenses resulting from enforced separation from dependents. This includes soldiers at a duty station within 50 miles of their family who are restricted to remain on base twenty-four hours a day, seven days a week, in excess of thirty consecutive days.

AR 37-104-4 Ch. 13, § 13-2(a) (2005) (superseded by AR 637–1 (July 2021)).

The Court agrees with the government that plaintiffs' requests for secretarial authorization and approval under this provision of the DOD Joint Travel Regulations–particularly with regard to retroactive requests–fall within the exclusive providence of the Secretary of the Army through the ABCMR. The Court further agrees the assessments should be made on a case-by-case basis, taking into account: whether the service member's dependents (one, some, or all) reside(d) at or near the PDS; the intended purpose of any dependent visits (i.e., visit or relocation); the duration of the cohabitation regardless of intent (i.e., more or less than 90 consecutive days); and whether the member in fact had/has to maintain separate households. Alternatively, the Secretary may decide that a blanket waiver or exception, in some form, should be adopted by the Army to account for the general need for reservists with dependents to maintain two households regardless of where their dependents reside. Either way, this issue must be resolved in the first instance by the Army on remand.

While the Secretary must adhere to the DOD Joint Travel Regulations, as highlighted above, the regulations vest considerable discretion in the Secretary to authorize or approve FSH in situations where the maintenance of two households is deemed necessary regardless of the established living arrangements between a service member and their dependents. *See* JTR Ch. 10, Part A, ¶ 10000(C) (ECF 85 at 73) (quoted above). The Court leaves to the Secretary of the Army or their designee (i.e., ABCMR) to make individualized determinations, grant a blanket waiver or exception, or work with the DOD to amend the Joint Travel Regulations to establish a general FSH entitlement for members of the reserve component with dependents based upon the presumption that reservists must maintain dual households to accommodate their hybrid military service and civilian responsibilities. However those issues are ultimately resolved, authorization or approval of a second housing allowance under this regulatory scheme is discretionary and, thus, effectively nonjusticiable.[28] *See Voge v. United States*, 844 F.2d 776, 779 (Fed. Cir. 1988) ("Judicial deference must be 'at its apogee' in matters pertaining to the military and national defense.") (quoting *Rostker v. Goldberg*, 453 U.S. 57, 70 (1981)). "[J]udges are not given the task of running the Army." *Orloff v. Willoughby*, 345 U.S. 83, 93 (1953), *quoted in Voge*, 844 F.2d at 779.

---

[28] *But see Antonellis v. United States*, 723 F.3d 1328, 1332 (Fed. Cir. 2013) ("[A]lthough the merits of a decision committed wholly to the discretion of the military are not subject to judicial review, a challenge to the particular procedure followed in rendering a military decision may present a justiciable controversy.") (quoting *Adkins v. United States*, 68 F.3d 1317, 1323 (Fed.Cir.1995)).

## II.      Amended Complaint

### A. Standard of Review

Under RCFC 15(a)(2), "a party may amend its pleading only with the opposing party's written consent or the court's leave."  Consistent with the governing rule's directive that leave should be "freely give[n] when justice so requires," this language is "liberally construed."  *See 3rd Eye Surveillance, LLC v. United States*, 140 Fed. Cl. 39, 52 (2018) (citing cases).  Nevertheless, the Court may deny a party's request to file an amended pleading where there is evidence of undue delay or the proffered amendment would be futile.  *See A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1158 (Fed. Cir. 2014).

"In cases in which proceedings have not concluded in the trial court, 'mere delay, without some showing of prejudice, bad faith, or futility [has been found to be] insufficient to deny a motion to amend a complaint.'"  *California ex rel. Yee v. United States*, 145 Fed. Cl. 802, 811 (2019) (alteration in original) (quoting *Alaska v. United States*, 15 Cl. Ct. 276, 280 (1988)).  Here, as explained in *supra* note 2, despite the age of this case, litigation remains in the early stages due in large part to the government's first request for a voluntary remand lasting two years.  Moreover, plaintiffs' proposed amendment–proffering an alternative theory of recovery–was not necessary or even reasonably contemplated until DFAS declared that the dual housing allowance payments initially authorized and paid by the Army and thereafter sanctioned by the ABCMR were not lawful and, thus, could not be remitted.  Plaintiffs cannot be penalized for the passage of time stemming from the voluntary remand or the time needed to litigate these issues of first impression; nor can the government make a credible argument of prejudice or bad faith.  Accordingly, the sole potential ground upon which to deny the requested amendment is futility.

"A motion to amend may be deemed futile if a claim added by the amendment would not withstand a motion to dismiss."  *Shoshone Indian Tribe of the Wind River Rsrv., Wyo. v. United States*, 71 Fed. Cl. 172, 176 (2006) (citing cases); *see also Kemin Foods, L.C. v. Pigmentos Vegetales Del Centro S.A. de C.V.*, 464 F.3d 1339, 1354–55 (Fed. Cir. 2006) ("When a party faces the possibility of being denied leave to amend on the ground of futility, that party must demonstrate that its pleading states a claim on which relief could be granted, and it must proffer sufficient facts supporting the amended pleading that the claim could survive a dispositive pretrial motion.") (citing cases).  To survive a motion to dismiss, plaintiffs' proposed claim and supporting factual allegations must at least "plausibly give rise to an entitlement to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

In evaluating futility, courts generally do not engage in an exhaustive assessment of the merits of the proffered amendment; rather, review is routinely limited to "whether a party's proposed amendment is facially meritless and frivolous . . . ." *St. Paul Fire & Marine Ins. Co. v. United States*, 31 Fed. Cl. 151, 155 (1994), *quoted in Yee*, 145 Fed. Cl. at 812.  Here, the complex statutory and regulatory scheme at play in this case–combined with the critical need for legal clarity regarding the issues to be considered on remand–nevertheless warrant more extensive analysis of plaintiffs' proffered alternative theory of recovery.

### B.  Futility Analysis: Travel and Transportation Allowances (Per Diem) Statute

As a preliminary matter, the Court has subject matter jurisdiction over plaintiffs' alternative claim to monetary relief under the Travel and Transportation Allowances (Per Diem) statute, 37 U.S.C. § 474 (2016) (repealed and recodified at 37 U.S.C. § 452).  Indeed, the pre-2021 version of the statute mandates the payment of per diem to service members, stating in relevant part:

> (a) Except as provided [below] and under regulations prescribed by the Secretaries concerned, a member of a uniformed service *is entitled to* travel and transportation allowances for travel performed or to be performed under orders . . . .
>
> > (1) upon a change of permanent station, or otherwise, or when away from his designated post of duty regardless of the length of time he is away from that post;
> >
> > (2) upon appointment, call to active duty, enlistment, or induction, from his home or from the place from which called or ordered to active duty to his first station;
>
> . . .
>
> (d)(1) The travel and transportation allowances authorized for each kind of travel may not be more than one of the following:
>
> > (2) Under regulations prescribed by the Secretaries concerned, a member of a uniformed service entitled to travel and transportation allowances under subsection (a) *is entitled to* any of the following:
> >
> > > (A) A per diem allowance at a rate not to exceed that established by the Secretaries concerned.

(B) Reimbursement for the actual and necessary expenses of official travel not to exceed an amount established by the Secretaries concerned.

(C) A combination of payments described in subparagraphs (A) and (B).

37 U.S.C. § 474(a) & (d) (emphasis added)[29]; *see* 28 U.S.C. § 1491(a)(1) (granting Court of Federal Claims "jurisdiction to render judgment upon any claim against the United States founded . . . upon . . . any Act of Congress"), *cited in United States v. Testan*, 424 U.S. 392, 400–01 (1976) (Court of Federal Claims' jurisdiction is limited to claims arising under money-mandating federal statutes).

The futility assessment of plaintiffs' proposed claim turns on whether plaintiffs are plausibly among the group of service members entitled to per diem under § 474. Since the military Secretaries are charged with administering regulations concerning "the conditions under which travel and transportation allowances are authorized," 37 U.S.C. § 474(b)(1)(A), plaintiffs' potential entitlement to per diem is determined by the DOD Joint Travel Regulations. Under the regulations, if plaintiffs' activation orders are temporary duty (TDY) orders rather than permanent change of station (PCS) orders, they are generally entitled to the claimed per diem. *See* JTR Ch. 4, Part B, ¶ 4050(A)(5) ("Per diem is applicable for *all* TDY and [permanent duty travel (PDT)] periods; except when an [Actual Expense Authorization (AEA)] is authorized/approved.") (emphasis added).

The relevant portions of plaintiffs' activation orders directed plaintiffs to return to their homes at the end of their deployments. *See, e.g.*, ECF 96 at 16 ("Upon completion of this duty, unless sooner released, you will return to your home and upon arrival be released from active duty."). Critical to the plausibility of plaintiffs' proposed claim, TDY orders may command a member to return to their last duty station, while PCS orders may not. *Compare* JTR App. A, Part 1 at A1-43 (defining "Temporary Duty (TDY)" as including: "Duty at one or more locations, away from the PDS, under an order providing for further assignment, or pending further assignment, *to return to the old PDS* or to proceed to a new PDS.") (emphasis added) *with id.* at A1-32 (defining "Permanent Change of Station (PCS)" as: "The assignment, detail, or transfer of an employee, member, or unit to a different PDS under a competent travel order that does *not* specify the duty as

---

[29] The current version of the per diem statute, in contrast, is permissive. *See* 37 U.S.C. § 452(a) ("Except as otherwise prohibited by law, a member of the uniformed services or other authorized traveler *may be provided* transportation, lodging, or meals-in-kind, or actual and necessary expenses of travel and transportation, for, or in connection with, official travel under circumstances as specified in regulations prescribed under section 464 of this title.") (emphasis added).

temporary, provide for further assignment to a new PDS, or *direct return to the old PDS*.") (emphasis added).

Since a reservist's home is considered their last (or old) PDS for housing allowance purposes, *see supra* note 16, it is plausible that a reservist's home is similarly considered their last (or old) PDS for purposes of interpreting or categorizing activation orders. Accordingly, in directing plaintiffs to return their homes, plaintiffs' activation orders may have effectively directed plaintiffs to their last (or old) PDS. If this argument succeeds, plaintiffs' orders would fit the regulatory definition of TDY orders rather than PCS orders.

In contradistinction, the government cites the DOD Joint Travel Regulations addressing "Special Circumstances Travel and Transportation" and, in particular, "Reserve Component (RC) Travel," in support of defendant's position that valid PCS orders may direct a reservist to "return to [their] primary residence or [Place Entered Active Duty (PLEAD)]" without necessarily converting them to TDY orders. *See* JTR Ch. 7, Part K ¶ 7355(A); *e.g.*, *id.* ¶ 7355(F) (distinguishing between TDY and PCS orders in discussing per diem and AEA payments). Although the government's position may ultimately prevail, at this juncture, the Court cannot conclude that plaintiffs' proposed alternative claim for relief is "facially meritless and frivolous." *See St. Paul Fire & Marine Ins.*, 31 Fed. Cl. at 155, *quoted in Yee*, 145 Fed. Cl. at 812.

That TDY orders are usually limited to 180 days, *see* JTR Ch. 2, Part C, ¶ 2230(B)(1), is similarly not fatal to plaintiffs' claimed entitlement to per diem as an alternative to FSH. While plaintiffs' activation orders provide for deployment exceeding 180 days, JTR Ch. 2, Part C, ¶ 2230(C) provides a procedure for authorizing extended TDY periods and, thus, extended per diem eligibility. The Court is unaware of any regulation or statute forbidding retroactive authorization. To the contrary, JTR Ch. 2, Part C, ¶ 2205 provides that "[a]n order . . . [m]ay be retroactively corrected to show the original intent . . . ." *Id.* (citation omitted).

Moreover, plaintiffs' allegation that their activation orders are TDY orders entitling them to per diem coheres with statements made by DOD leaders in seeking congressional passage of subsection (g) to 37 U.S.C. § 403. In a 2006 letter to congressional leaders, DOD's then-Acting General Counsel explained: "current law and Departmental policy is such that Reservists are paid BAH based on the location of their civilian residence and temporary duty entitlements (*i.e.*, per diem) at their duty location (even though they are permanently attached to the assigned command)." *See* ECF 100 at 16 (italics in original). To be clear, the impetus for the proposed statutory amendment to § 403 was to authorize the more cost-efficient alternative of paying reservists *without dependents* either two BAHs or a BAH and OHA. *See id.* at 15–16. Nonetheless, reservists with dependents should be afforded

the opportunity to address the potential merits of any analogous application or extension of DOD's expressed understanding and implementation.

Although it is unclear whether plaintiffs may recover under the Travel and Transportation Allowances (Per Diem) statute and the implementing regulations, these issues should not be decided by the Court in the first instance; rather, on remand, the ABCMR should consider whether any of the plaintiffs' activation orders were effectively TDY orders entitling them to per diem *as an alternative recovery* to FSH with regard to reservists with dependents or a second BAH/OHA with regard to reservists without dependents. As highlighted by the government during oral argument, there is already some confusion in the record involving Major Schneck. During the first remand, the ABCMR seemingly rejected Major Schneck's constructive temporary change of station (TCS) status theory of recovery, stating: "the Board determined this proposed relief is unnecessary having concurred with the assertion that [Major Schneck] was authorized both OHA and BAH while serving in Germany." *See* ECF 52-6 at 22. Nonetheless, the ABCMR recommended that Major Schneck receive per diem for the four-month period from May 17, 2019 through September 22, 2019, coinciding with the extension of his deployment orders to facilitate the Army's then-pending investigation. *See* ECF 52-6 at 23, 25.

## III.     Voluntary Remand

### A. Legal Standard

"The Tucker Act gives the Court of Federal Claims the authority 'to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just.'" *Wolfing I*, 144 Fed. Cl. at 521 (quoting 28 U.S.C. § 1491(a)(2)). Under RCFC 52.2, remand may be directed on motion filed by one or more parties or *sua sponte*. *Trace Sys. Inc. v. United States*, No. 22-404, 2022 WL 2963486, at *2 (Fed. Cl. July 26, 2022) (citation omitted). Similar to a motion to file an amended complaint, addressed *supra*, a request for a voluntary remand should be denied if the Court determines it is frivolous or made in bad faith. *See id.* As recently stated by this Court:

> [T]he true inquiry in deciding a motion to remand is if "the agency intends to take further action with respect to the original agency decision on review." *Limnia, Inc. v. United States Dep't of Energy*, 857 F.3d 379, 386 (D.C. Cir. 2017). An agency need not "confess error or impropriety in order to obtain a voluntary remand. But the agency ordinarily does at least need to profess intention to reconsider, re-review, or modify the original agency decision that is the subject of the legal challenge." *Id.* at 387; *see also Keltner v. United States*, 148 Fed. Cl. 552, 563 (2020) ("The case law thus makes clear that where an agency requests a remand without confessing error, the agency must express some intent to reconsider the original agency

decision that is the subject of the legal challenge, after which the court has discretion to grant or deny the motion.").

*Trace Sys.*, 2022 WL 2963486, at *2.

As found in *Wolfing I*, a (second) voluntary remand is appropriate to afford the Secretary of the Army and the ABCMR an opportunity to consider in the first instance the legal conclusions outlined in this decision regarding reservists' entitlement and eligibility to receive housing allowances in the forms of BAH, OHA, FSH-B, and FSH-O. *See Wolfing I*, 144 Fed. Cl. at 521–22. The overarching policy decisions and implications falling within the province of the Secretaries of Defense and the Army, and the individualized circumstances of each service member not yet fully developed, will play a critical role in determining whether plaintiffs (and other similarly situated service members) are entitled or otherwise eligible to receive dual housing allowances. If such relief is warranted, the ABCMR will be poised to simultaneously correct effected military personnel records and coordinate with DFAS to provide the requisite monetary relief.

## B. Instructions for Remand

Pursuant to RCFC 52.2(a) and (b)(1)(a), and at the request of the parties, this military pay case is voluntarily remanded to the Secretary of the Army and the ABCMR for a period of six months to consider whether plaintiffs are entitled or otherwise authorized and approved to receive (retroactively and prospectively, where applicable) housing allowances in the form of BAH, OHA, FSH-B, and FSH-O or, in the alternative, per diem, consistent with this decision. As part of the assessment of reservists with dependents and their entitlement and eligibility to receive FSH, the Secretary of the Army should consider whether a dependent residency exception or waiver is appropriate given the general need for reservists to return to their primary residence after completing their deployment. Depending upon how these issues are resolved, the Board should consider whether additional corrections to plaintiffs' military personnel records are warranted to remove information related to internal investigations and proceedings. The Board should also consider other relief such as the return of repayments or garnishments and convening SSBs, as necessary.

To facilitate the ABCMR's remand proceedings, as agreed by the parties during oral argument, within 60 days of this decision, plaintiffs and similarly affected reservists seeking administrative relief shall begin submitting applications to the ABCMR specifying the relief they seek under this decision as well as the factual basis for their claimed entitlement and eligibility. The Court leaves to the parties to determine the exact form and substance of the applications submitted on remand. To this end, absent good cause, plaintiffs and other service members seeking similar relief from the Board during the pendency of the second remand,

24

shall respond within 30 days to any reasonable requests by the Board for additional information regarding their actual living arrangements as well as the residency and whereabouts of their dependents, if any, during any period of the service member's deployment for which dual housing allowances are sought or accepted. At plaintiffs' request, and by consent, leave is hereby granted for plaintiffs to file successive amended complaints joining additional (similarly situated) plaintiffs during the remand period to allay any statute of limitations concerns.

Concomitantly, as requested by the government during oral argument, the ABCMR shall immediately seek an advisory opinion from the DOD Office of Assistant Secretary of Defense for Manpower and Reserve Affairs addressing the discretion vested in the Secretary of the Army to grant dual housing allowances under 37 U.S.C. § 403(g) and the implementing DOD regulations. To the extent the DOD is of the opinion the Secretary lacks such authority, or that the discretion has evolved since the passage of § 403(g)–and, more particularly, between October 2016 and the present–the advisory opinion must include a timeline of the evolution of the nature and scope of the discretion vested in the Secretary of the Army and the basis for the opined evolution. Additionally, the ABCMR must also immediately seek an advisory opinion from the Defense Human Resources Activity (DHRA) on whether per diem is (or ever was) authorized for reserve component members while serving on active duty under the Travel and Transportation Allowances statute, 37 U.S.C. § 474 (2016) (repealed and recodified at 37 U.S.C. § 452 (2021)), and the implementing DOD regulations. To the extent the DHRA is of the opinion that the authorization evolved between October 2016 and the present, the advisory opinion must include a timeline of the evolution of the per diem authorization and the basis for the opined evolution. As further requested by the government, the ABCMR must also clarify whether and, if so, to what extent, the Board construed Major Schneck's deployment orders as placing him in TCS status, entitling him to recover per diem.

In accordance with RCFC 52.2(b)(1)(B), the ABCMR shall complete its review and assessment within 180 days of this decision, subject to extension as provided in RCFC 52.2(c). Pursuant to RCFC 52.2(b)(1)(C), the Clerk will stay all proceedings in this matter until further order of the Court. The Court will retain jurisdiction over this case during the remand period. As required by RCFC 52.2(b)(1)(D), the defendant shall file a status report every 90 days during the remand period updating the Court on the progress of the remand proceedings.

In accordance with RCFC 52.2(d), within 30 days of the conclusion of the voluntary remand proceedings before the ABCMR, the ABCMR shall send to the Court the required copies of the final decision(s) reached by the Board. Within 30 days thereafter, pursuant to RCFC 52.2(e)(1), the parties shall file a joint status report setting forth the parties' position(s) regarding whether further litigation of

this matter is necessary.  If requesting further proceedings before the Court to resolve this case, then the parties shall include a proposed schedule going forward.

## CONCLUSION

For the reasons stated above:

(1) Plaintiffs' Second Motion for Leave to File an Amended Complaint (ECF 96) is **GRANTED**.

(2) Plaintiffs' proffered Amended Complaint (ECF 96-2) is deemed **FILED** by leave of the Court.

(3) Defendant's Motion for a Second Voluntary Remand to the ABCMR (ECF 72) is **GRANTED** consistent with the instructions specified herein.

(4) Pursuant to RCFC 52.2(a), this military pay case is **REMANDED** to the Secretary of the Army and the ABCMR to consider whether plaintiffs are entitled or otherwise authorized and approved to receive housing allowances or other subsidies consistent with this Opinion and Order as well as other relief specified herein.  During the requested remand:

   a.  Pursuant to RCFC 52.2(b)(1)(A):

      i.  Within 10 days of this Opinion and Order, the ABCMR shall request an advisory opinion from the DOD Office of Assistant Secretary of Defense for Manpower and Reserve Affairs addressing the discretion vested in the Secretary of the Army to grant dual housing allowances under 37 U.S.C. § 403(g) and implementing DOD regulations.  To the extent the DOD is of the opinion the Secretary lacks such authority, or that the discretion has evolved since the passage of § 403(g)–and, more particularly, between October 2016 and the present–the advisory opinion must include a timeline of the evolution of the nature and scope of the discretion vested in the Secretary of the Army and the basis for the opined evolution.

      ii.  Within 10 days of this Opinion and Order, the ABCMR shall request an advisory opinion from the Defense Human Resources Activity (DHRA) on whether per diem is (or was) authorized for reserve component members while serving on active duty under the Travel and Transportation Allowances statute, 37 U.S.C. § 474 (2016) (repealed and recodified at 37 U.S.C. § 452 (2021)), and the implementing DOD regulations.  To the extent the DHRA is of the opinion that the authorization evolved between

October 2016 and the present, the advisory opinion must include a timeline of the evolution of the per diem authorization and the basis for the opined evolution.

    iii.  Within 60 days of this Opinion and Order, plaintiffs and any similarly affected reservists seeking administrative relief shall begin submitting applications to the ABCMR specifying the relief they seek under the Court's decision as well as the factual basis for their claimed entitlement and eligibility.

    iv.  Absent good cause, plaintiffs and any similarly affected reservists seeking administrative relief shall respond to the Board's requests for relevant information within 30 days of such requests.

b.  Pursuant to RCFC 52.2(b)(1)(B), the ABCMR shall complete its review within 180 days.

c.  Pursuant to RCFC 52.2(b)(1)(C), the Clerk is directed to **STAY** all proceedings in this matter until further order of the Court.  The Court will retain jurisdiction over this case during the remand period.

d.  Pursuant to RCFC 52.2(b)(1)(D), the defendant shall **FILE** a Status Report every 90 days during the remand period updating the Court on the status of the remand proceedings.

e.  During the remand period, by consent, plaintiffs' request for leave to file successive amended complaints joining additional (similarly situated) plaintiffs is **GRANTED**.

f.  Pursuant to RCFC 52.2(d), within 30 days of the conclusion of the voluntary remand proceedings before the ABCMR, the ABCMR shall send the Court the required copies of the final decision(s) reached by the Board.

g.  Pursuant to RCFC 52.2(e)(1), the parties shall **FILE** a Joint Status Report within 30 days of the filing of the ABCMR's final decision(s) or other action on remand setting forth the parties' position(s) regarding whether further litigation of this matter is necessary.  If requesting further proceedings from the Court, then the parties shall include a proposed schedule to govern this case going forward.

(5) The Clerk shall **SERVE** a copy of this Order to the Secretary of the Army and the ABCMR:

>    Hon. Christine Wormuth
>    Secretary of the Army
>    Office of the Secretary of the Army
>    101 Army Pentagon
>    Washington, DC 20310-0101

>    and

>    Dennis W. Dingle
>    Director, Army Board for the Correction of Military Records
>    Army Review Board Agency
>    251 18th Street South – Suite 385
>    Arlington, VA 22202-3531

It is so **ORDERED**.


Armando O. Bonilla
Judge